FILED

SAFARIAN & BAROIAN, LLP
Harry A. Safarian (SBN 204106)
Alex A. Baroian (SBN 266021)
109 E. Harvard Street, Suite 300
Glendale, California 91205
Tel.: (818) 334-8528
Fax: (818) 334-8107

2013 AUG 26  PM 1:29

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

Email: hs@thesbfirm.com; ab@thesbfirm.com

Attorneys for Plaintiff, LENNY SPANGLER, individually and
on behalf of all similarly situated persons

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SACVB-1315-JAK (AJWx)

LENNY SPANGLER, in his individual
capacity and for all similarly situated
persons,

Plaintiffs,

v.

NEVADA PROPERTY 1, LLC, a
Delaware limited liability company;
DEUTSCHE BANK AG, a German
bank; TUTOR PERINI BUILDING
CORP., an Arizona corporation; FIRST
AMERICAN TITLE INSURANCE
COMPANY, a business entity of
unknown form; NEVADA TITLE
COMPANY, a Nevada corporation, and
DOES 1-100, inclusive,

Defendants.

[CLASS ACTION] COMPLAINT
FOR:

1. **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT ("RICO"), 18 U.S.C. § 1961 et seq.**

2. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200**

3. **FRAUD**

4. **NEGLIGENT MISREPRESENTATION**

5. **RESTITUTION (UNJUST ENRICHMENT)**

6. **BREACH OF CONTRACT**

7. **BREACH OF FIDUCIARY DUTY**

8. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING [AGAINST FIRST AMERICAN AND NEVADA TITLE]**

9. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING [AGAINST DEUTSCHE BANK NEVADA**

1

CLASS ACTION COMPLAINT

PROPERTY 1, LLC]

10. MONEY HAD AND RECEIVED

11. CONVERSION

12. RESCISSION (BASED ON FRUSTRATION OF PURPOSE)

13. RESCISSION (BASED ON FAILURE OF CONSIDERATION)

14. RESCISSION (BASED ON FRAUDULENT INDUCEMENT MISTAKE)

15. RESCISSION (BASED ON MISTAKE)

16. RESCISSION (BASED ON MUTUAL MISTAKE AND LACK OF CONSIDERATION)

Plaintiff LENNY SPANGLER, on behalf of himself and all similarly situated persons (hereinafter collectively referred to as "PLAINTIFFS"), alleges against Defendants, and each of them, as follows:

## **JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this matter because:

a.     Federal Question: This is a civil action for violations of 18 U.S.C. § 1961 et seq.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

b.     Class Action Fairness Act ("CAFA"): As more fully described below, the amount in controversy in this case exceeds $5 million, and CAFA's requisite "minimum diversity" is met. PLAINTIFFS are California citizens, and Defendants ("Defendants" refers to all named Defendants, collectively) are business entities that exist by virtue of, and have their principal places of business in, Germany and the States of Arizona, Nevada, and New York.

2.     This court has jurisdiction over Defendants because Defendants have purposefully availed themselves to the benefits and protections of the State of

CLASS ACTION COMPLAINT

1   California, and knowingly entered into contracts with PLAINTIFFS, each of which

2   is a California resident, and knowingly transacted affairs with, and sent

3   communications through, the mails and electronic mail, to PLAINTIFFS located in

4   this District.

5       3.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because

6   Defendants' conduct giving rise to PLAINTIFFS' claims occurred in, and were

7   directed to, PLAINTIFFS residing in the Central District of California. Venue is

8   also proper pursuant to 18 U.S.C. § 1965(a) because Defendants have transacted

9   affairs in this District.

10

11                              **THE PARTIES**

12      4.    PLAINTIFFS are individuals who paid earnest money deposits

13  towards the purchase of condominium units in The Cosmopolitan of Las Vegas,

14  formerly known as the Cosmopolitan Resort & Casino ("Cosmopolitan").

15  PLAINTIFFS accepted a class action settlement in the consolidated case, *Watt v.*

16  *Nevada Property*, Clark County District Court Case No. A582541 ("Class Action

17  Lawsuit"). Plaintiff LENNY SPANGLER is an individual who is, and at all times

18  relevant to this action was, a resident of the County of Orange, State of California.

19      5.    Defendants are:

20          a.    Nevada Property 1, LLC ("NP1"), which is, and at all relevant

21  times was, a limited liability company formed under the laws of the State of

22  Delaware with its principal place of business at 3900 Paradise Road, Suite U, Las

23  Vegas, Nevada 89109.

24          b.    Defendant DEUTSCHE BANK AG, ("Deutsche Bank"), which

25  is, and at all relevant times was, a German bank with its principal place of business

26  in New York, New York.

27          c.    Defendant TUTOR PERINI BUILDING CORPORATION

28  ("Perini"), which is, and at all relevant times was, a corporation formed under the

3

CLASS ACTION COMPLAINT

1  laws of the State of Arizona with its principal place of business at 2955 North Green
2  Valley Parkway, Henderson, NV 89014.

3          d.      Defendant FIRST AMERICAN TITLE INSURANCE
4  COMPANY ("FATCO"), which is, and at all relevant times was, a California
5  Corporation with its principal place of business in the County of Orange, State of
6  California.

7          e.      Defendant NEVADA TITLE COMPANY ("NTC"), which is,
8  and at all relevant times was, a Nevada Corporation with its principal place of
9  business at 2500 N. Buffalo Drive, Las Vegas, Nevada.

10          f.      The true names and/or capacities, whether individual, corporate,
11  associate or otherwise, of defendant DOES 1 through 100, inclusive, are unknown to
12  PLAINTIFFS. Accordingly, PLAINTIFFS sue such unknown defendants by
13  fictitious names. PLAINTIFFS are informed and believe, and thereupon allege, each
14  fictitiously named defendant is legally responsible, negligently or in some other
15  actionable manner, for the events and happenings hereinafter referred to, and that
16  the acts and omissions of said defendants were a legal cause of PLAINTIFFS'
17  damages. PLAINTIFFS will amend this Complaint to assert the true names and/or
18  capacities of such fictitiously named defendants when the same have been
19  ascertained.

20          6.      PLAINTIFFS are informed and believe and thereupon allege that, at
21  all times mentioned herein, defendants were the agents, servants, employees,
22  successors-in-interest and/or joint venturers of their co-defendants and were, as
23  such, acting within the purpose, course, scope and authority of said agency,
24  employment, successor-in-interest and/or joint venture, and that each and every
25  defendant as aforesaid was acting as a principal and was negligent in the selection
26  and hiring and retention of each and every defendant as an agent, employee,
27  successor-in-interest and/or joint venturer.

28

CLASS ACTION COMPLAINT

**INTRODUCTION**

7.     In 2005 and 2006, PLAINTIFFS entered into Purchase and Sale Agreements with 3700 Associates, LLC ("3700 Associates"), the Cosmopolitan's original developer, for the purchase of luxury condominiums in the Cosmopolitan. Consistent with the terms of the Agreements, PLAINTIFFS each paid earnest money security deposits to 3700 Associates of 20% of the purchase price of their respective condominium units.

9.     At the time PLAINTIFFS entered in to the Purchase and Sale Agreements, the Cosmopolitan was marketed as a five-star luxury condominium resort on the Las Vegas Strip. 3700 Associates promised PLAINTIFFS the luxury condominium units would be ready for occupancy in late-2007 or early-2008.

10.     In March 2008, 3700 Associates defaulted on its construction loan with Deutsche Bank. Through its wholly-owned subsidiary, NP1, Deutsche Bank foreclosed on the property, thereby acquiring all rights and obligations under the Purchase and Sale Agreements between PLAINTIFFS and 3700 Associates.

11.     Immediately upon the foreclosure, PLAINTIFFS made repeated verbal and written inquiries of Deutsche Bank and NP1 (collectively, "BANK DEFENDANTS") concerning the foreclosure and status of the condominium project. BANK DEFENDANTS disregarded the communications and effectively ceased all communication with PLAINTIFFS. At the time, the project was already behind schedule.

12.     In February 2009, the vast majority of the Cosmopolitan's nearly 2,000 condominium purchasers filed the Class Action Lawsuit, which sought recovery of PLAINTIFFS' earnest money deposits and interest earned based on the failure to timely complete PLAINTIFFS' condominiums. Although the condominium project was not completed, BANK DEFENDANTS responded by accusing PLAINTIFFS of breaching the Purchase and Sale Agreements by failing to timely close escrow and complete the purchase of the condominiums. PLAINTIFFS and BANK

CLASS ACTION COMPLAINT

DEFENDANTS, in late-2009, reached a settlement by which PLAINTIFFS who had contracts to purchase units in the Cosmopolitan's West Tower received 74.4% of their deposits, and purchasers of East Tower units received 68% of their deposits.

13.    Following settlement, PLAINTIFFS learned BANK DEFENDANTS obtained the settlements through Defendants' fraud and deceit. Defendants misled PLAINTIFFS to believe the condominiums would be completed and delivered, and that PLAINTIFFS were obligated to close escrow on the units. In reality, BANK DEFENDANTS, by the time of the settlement, had abandoned all plans to complete the condominium units—a fact they concealed until after the settlement. Defendants had a duty to disclose this material fact, which would have entitled PLAINTIFFS to recover 100% of their earnest money deposits.

14.    Beginning in early 2009 at the latest, BANK DEFENDANTS and Perini secretly redesigned the Cosmopolitan from a condominium development to a hotel and casino. BANK DEFENDANTS, working with Perini, slashed the number of condominium units by 85%. In doing so, BANK DEFENDANTS and Perini scattered the handful of condominium units they planned to complete among hotel units, eliminating many of the promised amenities. All of these changes were done without PLAINTIFFS' knowledge or consent. In making these changes, BANK DEFENDANTS eliminated any possibility they could comply with the Purchase and Sale Agreements. As such, PLAINTIFFS were entitled to a full refund of their security deposits, plus interest.

15.    After abandoning plans to complete the condominium units, Defendants falsely claimed the units would be completed. Defendants, and each of them, knew BANK DEFENDANTS abandoned the condominium development, but conspired to conceal, and did conceal, this information from PLAINTIFFS and the public until after the settlement. BANK DEFENDANTS fraudulently concealed abandonment of the project with the purpose of depriving PLAINTIFFS of over $150 million in earnest money deposits and interest. Perini, FATCO and NTC were

CLASS ACTION COMPLAINT

1 privy to these facts, and were complicit in concealing them. Perini, FATCO and

2 NTC conspired with BANK DEFENDANTS in order to maintain favor, and win

3 favor, with Deutsche Bank, a multi-billion dollar German bank. Perini, FATCO, and

4 NTC, in doing so, placed BANK DEFENDANTS' interests ahead of PLAINTIFFS'.

5     16.    PLAINTIFFS were entitled to know the truth—that BANK

6 DEFENDANTS abandoned the condominium project, which entitled PLAINTIFFS

7 to a full refund of their earnest money deposits. In hopes of securing future contracts

8 with a multi-billion German bank, Perini, FATCO and NTC actively concealed

9 critical information. Indeed, as detailed below, Defendants, through a campaign of

10 harassment, threats, and intimidation, pressured PLAINTIFFS into believing they

11 would lose their full deposits if they did not succumb to BANK DEFENDANTS'

12 settlement offer and forego millions of dollars in security deposits. Defendants'

13 conspiracy proved successful.

14     17.    In 2009—two years after the condominium units were supposed to

15 have been completed—BANK DEFENDANTS, with the help of Perini, FATCO,

16 and NTC, launched a campaign of harassment and intimidation aimed at pressuring

17 PLAINTIFFS to forego earnest money deposits. As part of their campaign, BANK

18 DEFENDANTS: (a) demanded PLAINTIFFS commit to close escrow (on

19 condominium units BANK DEFENDANTS secretly abandoned) within weeks or

20 lose their full deposits, (b) continually threatened to file lawsuits for anticipatory

21 breach against any buyers requesting information about their units, or seeking return

22 of their deposits, and (c) disingenuously claimed PLAINTIFFS breached their

23 purchase agreements and, therefore, forfeited their deposits, by the mere filing of the

24 Class Action Lawsuit. BANK DEFENDANTS deliberately assumed this aggressive

25 posture in a calculated effort to conceal abandonment of the condominium project,

26 and to intimidate PLAINTIFFS into foregoing their earnest money deposits.

27     18.    Defendants were obligated to inform PLAINTIFFS that BANK

28 DEFENDANTS abandoned the condominium project prior to the settlement.

CLASS ACTION COMPLAINT

1   Defendants worked together to conceal this information until settlement of the Class
2   Action Lawsuit. But for this concealment, PLAINTIFFS would not have settled for
3   less than 100% of their earnest money deposits. Thus, Defendants fraudulently
4   induced PLAINTIFFS to settle for millions less than PLAINTIFFS were entitled to
5   recover.

6       19.     Defendants' actions described herein were part of a calculated pattern
7   of illegal activity carried out as part of an enterprise designed to fraudulently deny,
8   and which did deny, PLAINTIFFS of millions of dollars in earnest money deposits.
9   Defendants racketeered PLAINTIFFS through corrupt, illegal business practices.
10

11   **A. The Cosmopolitan Condominium Project.**

12       20.     Construction of the Cosmopolitan began on October 25, 2005. Original
13   plans called for a West Tower consisting of approximately 1200 condominiums and
14   800 hotel rooms, and an East Tower consisting of approximately 700 condominiums
15   and 300 hotel rooms.

16       21.     In 2005 and 2006, PLAINTIFFS entered into Condominium Purchase
17   and Sale Agreements with 3700 Associates for the purchase of condominium units
18   in the Cosmopolitan (hereinafter the "Agreements"). PLAINTIFFS each paid 20%
19   of the purchase price as earnest money deposits towards the purchase of the units.
20   Units ranged in price from about $500,000 to $1.5 million each. The Agreements
21   required PLAINTIFFS to pay the balance of the purchase price at closing.

22       22.     At the time of the Agreement, PLAINTIFFS were told the development
23   of the Cosmopolitan would be primarily residential.

24       23.     Throughout the sales process, Defendants represented to PLAINTIFFS
25   that (a) the project would have a ratio of approximately 2,000 condominium units to
26   1,000 hotel rooms, (b) the condominium units would be completely segregated from
27   the project's hotel rooms, and (c) the condominium units would have exclusive
28   elevators, pools and other amenities that would not be accessible to the hotel's

8

CLASS ACTION COMPLAINT

transient guests. For example, PLAINTIFFS were provided a "Fact Sheet" and "Commonly Asked Questions and Answers," which state, among other things:

> Q:  How many units are there in the building?
>
> *A:  There are approximately 3000 total units. Approximately 2000 are condo and the remaining 1000 are hotel rooms.*
>
> Q:  Are the hotel rooms mixed with the Condo Hotel rooms?
>
> *A:  No, the hotel rooms are at the back of the building.*

24.     The 2,000/1000 ratio of condominium units to hotel rooms, as well as the exclusive amenities and segregation from hotel guests, were essential terms of the Agreements. The importance of these terms is evidenced by Paragraph 17.3 of the Agreements, which gives PLAINTIFFS the right to rescind the Agreements and receive a full refund of their deposits, plus interest, if the final recorded subdivision map differs "materially and adversely" from the original provisional maps.

25.     The language of Paragraph 17.3 differs slightly between the Agreements for purchasers of condominium units in the West and East Towers of the Cosmopolitan, but the key language is the same. With respect to the West Tower Agreements, Paragraph 17.3 states:

> In the event that the approved and recorded final subdivision map for the Condominium differs materially and adversely from the Provisional Subdivision Map, Buyer may terminate this Agreement and request the return of Buyer's deposits, together with all interest earned thereon, by providing Seller with written notice of such termination within ten (10) days of the recordation of the final subdivision map for The Cosmopolitan, whereupon all parties hereto shall be released from their obligations hereunder.

26.     With respect to the East Tower Agreements, Paragraph 17.3 states:

> In the event that the approved and recorded final subdivision map for the Condominium differs materially and adversely from the Provisional Subdivision Map with respect to the Unit, Buyer may terminate this Agreement

CLASS ACTION COMPLAINT

1
2
3
4
5

and request the return of Buyer's deposits, together with all interest earned thereon, by providing Seller with written notice of such termination within ten (10) days of the Seller's mailing of written notice of the recording of the final subdivision map for the Condominium to the notice address specified by Buyer herein, whereupon all parties hereto shall be released from their obligations hereunder.

6

7   **B. 3700 Associates, LLC Defaults On Its Construction Loan.**

8        27.     On December 30, 2005, 3700 Associates obtained a $760 million

9   construction loan from Deutsche Bank. As part of that loan, 3700 Associates

10   assigned all rights and obligations under the Agreements to Cosmo Senior

11   Borrower, LLC, who in turn assigned all rights and obligations under the

12   Agreements to Deutsche Bank Trust Company Americas. Both Cosmo Senior

13   Borrower, LLC, and Deutsche Bank Trust Company Americas are wholly owned

14   subsidiaries of Deutsche Bank.

15        28.     By January 2008, the original $1.5 billion construction budget for the

16   Cosmopolitan ballooned to approximately $4.5 billion. 3700 Associates was unable

17   to obtain additional financing to make payments due on the construction loan. In

18   January 2008, 3700 Associates defaulted on its loan with Deutsche Bank.

19        29.     On or about July 18, 2008, Deutsche Bank, through Cosmo Senior

20   Borrower, LLC, foreclosed on the construction loan. On or about September 3,

21   2008, Deutsche Bank's wholly owned subsidiary, NP1, acquired ownership of the

22   Cosmopolitan. In doing so, it acquired all rights and obligations under the

23   Agreements through a non-judicial foreclosure sale.

24

25   **C. Class Action Settlements.**

26        30.     Approximately 1500 of the Cosmopolitan's nearly 2,000 buyers

27   accepted settlements of the Class Action Lawsuits, resulting in a partial refund of

28   PLAINTIFFS' deposits. Purchasers of units in the Cosmopolitan's West Tower

CLASS ACTION COMPLAINT

1  received 74.4% of their deposits, and purchasers of East Tower units received 68%
2  of their deposits.

3      31.    The settlements were procured by fraud as described herein, and more
4  particularly below. This fraud resulted in PLAINTIFFS forfeiting $150 million in
5  deposits, plus interest. Had Defendants disclosed the true facts—that BANK
6  DEFENDANTS abandoned the condominium project—PLAINTIFFS would not
7  have accepted less than a full refund of their earnest money security deposits and
8  interest, which PLAINTIFFS were entitled to by law.

9

10  **D. Defendants Fraudulent Inducement of Plaintiffs to Enter Settlements.**

11      32.    As of 2008 at the latest, BANK DEFENDANTS had fallen so far
12  behind on construction of the condominiums that they decided to redesign the
13  Cosmopolitan as a hotel/casino. In doing so, they abandoned development of
14  PLAINTIFFS' condominiums. Defendants concealed this material information from
15  PLAINTIFFS and the public, violating state and federal law. Defendants
16  fraudulently misled PLAINTIFFS to believe the condominium project was
17  progressing. Defendants pressured PLAINTIFFS to believe they would be liable for
18  breach if they failed to close on their units—the same units BANK DEFENDANTS
19  had already abandoned construction on.

20      33.    On information and belief, BANK DEFENDANTS devised this plan in
21  conjunction with their contractor, Perini, their escrow company, NTC, and their title
22  insurer, FATCO. Defendants Perini, FATCO and NTC, standing to gain
23  extraordinary future revenues from BANK DEFENDANTS, placed BANK
24  DEFENDANTS' interests ahead of PLAINTIFFS. In 2008 alone, Deutsche Bank
25  showed, publicly, net revenue of $92.45 billion. Defendants Perini, FATCO and
26  NTC had access to this public information, and knew the German Bank was one of
27  the most powerful corporations in the world. Perini, FATCO and NTC engaged in

28

1  the conspiracy described herein in order to advance their own economic interests by
2  securing favor with BANK DEFENDANTS.

3      34.    Had Defendants complied with their obligations under federal and state
4  law, informed PLAINTIFFS about changes in the Cosmopolitan's design, and not
5  coordinated concealment of BANK DEFENDANTS' abandonment of the
6  condominium project, PLAINTIFFS would not have forfeited approximately $150
7  million in earnest money deposits and interest—moneys PLAINTIFFS were entitled
8  to recovery as a matter of law.

9

10     **1.  *BANK DEFENDANTS and Perini Fall Behind in Completion***
11         ***Schedule.***

12     35.    Prior to and subsequent to the execution of the Agreements, 3700
13  Associates promised PLAINTIFFS, in writing, the Cosmopolitan would be
14  completed and close no later than mid-2008. These promises were made to all
15  PLAINTIFFS in writing as follows:

16

17         a.    The Cosmopolitan provided PLAINTIFFS a document entitled
18               "Commonly Asked Questions and Answers," wherein 3700
19               Associates represented, "the scheduled completion date [is] Late
20               2007, early 2008."
21         b.    In a September 1, 2004 Press Release, 3700 Associates
22               represented the Cosmopolitan was "projected to open in late
23               2007 or early 2008."
24         c.    In a November 22, 2004 Press Release, 3700 Associates
25               represented the Cosmopolitan was "projected to . . . open in late
26               2007 or early 2008."

27

28

CLASS ACTION COMPLAINT

d.     In a February 17, 2005 Press Release, 3700 Associates represented the Cosmopolitan was "scheduled to . . . open in early 2008."

e.     In an April 6, 2005 Press Release, 3700 Associates represented the Cosmopolitan was "scheduled to . . . open in early 2008."

f.     In an October 25, 2005 Press Release, 3700 Associates represented that the Cosmopolitan was "projected to open in mid-2008."

g.     In a January 11, 2006 Press Release, 3700 Associates represented the Cosmopolitan was scheduled to open "in mid-2008."

h.     In popular magazines such as Cigar Aficionado and 944, 3700 Associates represented the Cosmopolitan was scheduled to open in mid-2008.

36.    In a Property Report dated April 14, 2005, and filed with the Department of Housing and Urban Development, 3700 Associates stated, "The delivery of the deed is estimated to be on or before January, 2009." Defendants did not update this Property Report. Nor did they provide updated copies of the Property Report to PLAINTIFFS, as required by law.

37.    Contrary to their representations to PLAINTIFFS, and unbeknownst to PLAINTIFFS, on or around March 2008, BANK DEFENDANTS ordered Perini to stop almost every phase of construction while it completely redesigned the project to make it more marketable as a hotel-only casino. Perini concealed this information from PLAINTIFFS and the public. This owner-imposed stop order caused a one-year delay and assured the Cosmopolitan could not be opened until the end of 2010, at the earliest. This delay and redesign was concealed from PLAINTIFFS.

38.     In mid-2009, BANK DEFENDANTS ordered Perini to halt construction on the top 20 floors of the Cosmopolitan's West Tower condominium units for an indefinite time period. This further delayed completion of those units by at least six months, and assured the units would not be completed until July 2011 at the earliest. This delay was also concealed from PLAINTIFFS.

39.     BANK DEFENDANTS' decision to stop construction of the vast majority of the proposed condominiums is confirmed in letters from Cosmopolitan's architect, Friedmutter Group, containing recommendations for "shelling" floors 33-54 and performing only minimal construction on floors 31 and 32 to create a "buffer" for the shelled floors.

40.     The plans to create shell and buffer floors included many of the units that were intended to be sold to PLAINTIFFS. Defendants were aware of, and concealed, these plans from PLAINTIFFS.

## 2. *BANK DEFENDANTS and Perini Redesign the Cosmopolitan to Eliminate Condominium Units.*

41.     At the time PLAINTIFFS and BANK DEFENDANTS entered into the class action settlement, BANK DEFENDANTS had already abandoned all plans to build the condominiums. BANK DEFENDANTS concealed this material fact and, in fact, throughout the settlement process, misrepresented that they would deliver the units. During this time, in order to pressure PLAINTIFFS into accepting the settlement, BANK DEFENDANTS threatened that any PLAINTIFFS that did not close would lose their full deposits.

42.     The fact BANK DEFENDANTS abandoned development of the condominium units is clear form major design changes BANK DEFENDANTS and Perini secretly devised in the months preceding the settlement, including:

CLASS ACTION COMPLAINT

a. In April 2009, all cooktops in the units were removed, and all power to the cooktops was cut off. The cooktop designs were replaced with hotel amenity trays.

b. Locks were placed on the units' refrigerators and dishwashers.

c. Washers and driers were removed from the units. And, upon deciding it was cost prohibitive to remove the attendant plumbing, BANK DEFENDANTS installed dead bolts on all laundry closet doors.

d. Only one electrical meter was installed for the entire property, rather than for each unit as required for condominiums by Nevada Administrative Code § 704.560. The revised electrical meter configuration rendered it impossible for electricity usage to be measured on a per-unit basis. The revised configuration, common for hotel developments, was inappropriate and illegal for condominiums.

e. PLAINTIFFS' units were modified to include pass-through doors between adjacent units. This configuration, while typical for hotel rooms, was not feasible for residential condominium units where occupants expect privacy and exclusive access. PLAINTIFFS never authorized these doors.

f. Amenities promised as part of the condominium project, such as an 1800 seat theater and private swimming pools for residents, were removed.

g. PLAINTIFFS' balconies were modified to include a handrail extension extending inward several inches to protect the hotel from potential liability to transient guests, reducing the livable square footage of the balconies designed for PLAINTIFFS' units.

h. Designs for floor-to-ceiling and wall-to-wall windows were replaced with spandrel glass (glass outside, foil insulation inside) in lieu of the vision glass panels promised to PLAINTIFFS.

15

i.   A variance was obtained for the minimum number of parking spaces required by law, allowing for 32% fewer spaces and a reduction of parking space size in the underground parking. The revised parking plans included only 3,420 parking spaces, an insufficient number to accommodate occupants of the 3,000 promised condominium units, some of which have 3 bedrooms. The revised configuration would require off-site parking for the units. This change violated a commitment to PLAINTIFFS in a brochure entitled "Project Overview," which states the West Tower would have "One Button Convenience" to allow PLAINTIFFS access to their parking spaces, condominiums, and common areas with one elevator.

43.    Around the same time these major design changes were made, BANK DEFENDANTS renegotiated their contracts with Perini from a "cost plus" basis to a "not to exceed" basis, creating a large incentive for Perini to scrimp on quality and safety. BANK DEFENDANTS and Perini concealed this material change from PLAINTIFFS and the public until after the settlements.

44.    The abandonment of the condominium project is further evidence by the fact BANK DEFENDANTS, in 2008, stopped attempting to sell remaining unsold condominium units, terminating its listing agreement with its broker.

45.    BANK DEFENDANTS eventually removed all references to condominiums from their website. Shortly after the BANK DEFENDANTS and PLAINTIFFS agreed to the settlement in or around October 2009, BANK DEFENDANTS released to the media the fact they would abandon the condominium development and operate the Cosmopolitan as hotel and casino. BANK DEFENDANTS had disavowed such plans to PLAINTIFFS and ignored their requests for information on the subject leading up to the settlement. Only after

CLASS ACTION COMPLAINT

the settlement did BANK DEFENDANTS reveal their true intentions, reporting information in the media such as the following:

    a. In a November 19, 2009 article entitled, *Deutsche Bank Drowning in Vegas Costliest Bank-Owned Casino,* BANK DEFENDANTS posted on Bloomberg.com that the Cosmopolitan project was a "resort and casino";

    b. In November 2009, BANK DEFENDANTS published INTERNET advertisements for employment opportunities in the "Hotel – Resort" industry, stating that the Cosmopolitan will be operated as a hotel;

    c. In a December 7, 2009 article in the Las Vegas Review Journal, it was revealed the Cosmopolitan was "seemingly dropping [its] condominium component";

    d. The Cosmopolitan website was revised after the settlement, stating it would have "2995 hotel rooms and condo-style accommodations." The website made no mention of condominium units, or how one could purchase a condominium unit;

    e. In a March 8, 2010 article published in the Las Vegas Business Press entitled, *Cosmopolitan Nixes Residences, Refunds Deposits,* it was revealed Defendants "nixed" their condominium component.

### 3. *Subdivision Maps Confirm Defendants' Fraud.*

46.    Maps filed by BANK DEFENDANTS with Clark County further confirm BANK DEFENDANTS concealed, until the after the settlements, full scale abandonment of the condominium project as demonstrated by the following chronology:

a. In July 2005, 3700 Associates submitted a tentative subdivision map calling for 2,098 condominium units and 900 hotel units (the "2,098-unit Provisional Subdivision Map").

b. In August 2006, 3700 Associates submitted another tentative subdivision map calling for 2,174 condominium units, 824 hotel units, and one commercial unit (the "2,174-unit Provisional Subdivision Map").

c. On August 14, 2008, BANK DEFENDANTS resubmitted the 2,174-unit Provisional Subdivision Map to Clark County. Although this map was approved a few months later, BANK DEFENDANTS never had it recorded.

d. After settling with PLAINTIFFS, in mid- to late-2010, BANK DEFENDANTS submitted the final subdivision maps for both West and East Towers of the Cosmopolitan to Clark County, which call for a total of 315 condominium units, 2,683 hotel units, and one commercial unit (the "315-unit Final Subdivision Map"). Notably, the condominium units are not segregated from hotel units, but are randomly interspersed amongst the hotel units.

### 4. *Defendants Use Mail and Internet Services in an Attempt to Strong Arm Plaintiffs into Settlements.*

47.     BANK DEFENDANTS instructed FATCO to harass PLAINTIFFS with a letter threatening an imminent cash closing. Like BANK DEFENDANTS, FATCO knew the condominium project would not close. FATCO refused to provide any closing date in its communications with PLAINTIFFS, and breached its fiduciary obligation to PLAINTIFFS to disclose BANK DEFENDANTS had already abandoned the condominium project.

48.     The referenced misinformation, distributed through the U.S. mails and Internet lines, were calculated attempts by Defendants to convince PLAINTIFFS they would lose their entire deposits if they did not close escrow or settle Class Action Lawsuit, and to cause PLAINTIFFS to forego millions in earnest money deposits.

### 5. *Defendants' Defraud Plaintiffs of $150 Million in Earnest Money Deposits Plaintiffs Were Entitled to Recover.*

49.     In a concerted effort to deprive PLAINTIFFS of earnest money deposits, Defendants concealed the critical facts described above, and worked together to falsely convince PLAINTIFFS that BANK DEFENDANTS were still planning to deliver the condominiums.

50.     Defendants' concealment of material facts, and their strategic use of misinformation and making of misrepresentations, had precisely the effect Defendants desired. PLAINTIFFS were lead to believe BANK DEFENDANTS had the capability and intention of delivering the condominiums. As such, PLAINTIFFS agreed to accept only a fraction of earnest money deposits.

51.     But for the fraudulent concealment and misrepresentations by Defendants, PLAINTIFFS would never have accepted anything less than their full earnest money deposits and interest. Defendants were obligated to reveal the fact the condominium project had been abandoned, but colluded to suppress material facts, including that: (1) BANK DEFENDANTS decided to convert the Cosmopolitan into an all-hotel project; (2) PLAINTIFFS' units were not being built to meet state and federal requirements; and (3) BANK DEFENDANTS made material changes to the design of PLAINTIFFS' units as described herein.

52.     PLAINTIFFS had a right to know the foregoing material facts so that they would have the opportunity to rescind their purchase contracts and demand an immediate refund of their deposits. Defendants had an obligation to disclose these

1  material facts to PLAINTIFFS as soon as they learned of them. Instead, Defendants
2  deliberately concealed these facts and made active misrepresentations to deprive
3  PLAINTIFFS the opportunity to make an informed decision concerning the
4  settlement. In the end, PLAINTIFFS were deprived of more than $150 million in
5  earnest money deposits and interest thereon.

6

7  ## FIRST CAUSE OF ACTION
8  ### (VIOLATION OF RICO, 18 U.S.C. § 1961 ET SEQ.
9  ### AGAINST ALL DEFENDANTS)

10  53.  PLAINTIFFS incorporate by reference, as though set forth in full, each
11  and all of the allegations set forth previously herein.

12  54.  Defendants engaged in a pattern of racketeering activity pursuant to 18
13  U.S.C. § 1961 et seq. by repeatedly conspiring to violate 18 U.S.C. § 1343 in using
14  the U.S. mail and internet lines to execute their scheme to defraud.

15  55.  Between May and December 2009, Defendants conspired to use the
16  U.S. mails and internet lines to make misrepresentations to PLAINTIFFS in
17  furtherance of their fraud. Specifically, Defendants misrepresented that BANK
18  DEFENDANTS were intending to convey approximately 2,000 condominium units
19  to the buyers. Defendants further misrepresented that they would force
20  PLAINTIFFS to close on their units or forfeit their deposits. In reality, Defendants
21  have known since 2008 that they were changing the Cosmopolitan into an all-hotel
22  casino-resort, and that they were legally obligated to return all of PLAINTIFFS
23  deposits, plus interest.

24  56.  A wire fraud violation consists of (1) the formation of a scheme or
25  artifice to defraud (2) use of the United States wires or causing a use of the United
26  States wires in furtherance of the scheme; and (3) specific intent to deceive or
27  defraud. *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393,
28  1400 (9th Cir. 1986).

57.     Defendants created a fraudulent scheme to deceive PLAINTIFFS. In furtherance of the fraudulent scheme, Defendants represented to PLAINTIFFS that they were preparing for conveyance approximately 2,000 condominium units. Defendants created this scheme in order to keep the millions that PLAINTIFFS had deposited in escrow toward the purchase of units at the Cosmopolitan.

58.     The representations made to PLAINTIFFS were false and were made to induce PLAINTIFFS into forfeiting earnest money deposits and interest. In reality, prior to settlement of the Class Action Lawsuit, BANK DEFENDANTS had abandoned their plans to build PLAINTIFFS' condominium units—a fact Defendants knew, but concealed. Defendants conspired to keep this information from PLAINTIFFS and the public until settlement.

59.     In furtherance of their scheme to defraud PLAINTIFFS, Defendants engaged in multiple occasions of using the United States mail and the Internet.

60.     As a direct and proximate result of the foregoing, PLAINTIFFS have suffered monetary damages, including, but not limited to, the loss of earnest money deposits and interest as stated herein.

61.     Defendants' actions were knowing, intentional, deliberate, and malicious, and said actions proximately and directly caused PLAINTIFFS' alleged damages.

62.     The intentional, callous, willful, wanton and oppressive acts of Defendants, as set forth herein, are sufficient to warrant the imposition of treble damages against them.

## SECOND CAUSE OF ACTION

### (VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 AGAINST ALL DEFENDANTS)

63.     PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

21

64.     California Business and Professions Code section 17200 prohibits unlawful, unfair, or fraudulent business practice or act.

65.     As alleged herein, Defendants, individually and as co-conspirators, engaged in the business practice or act of misrepresenting material facts concerning the construction of the condominiums, specifically concealing the fact all plans to construct the condominiums had been abandoned, and that PLAINTIFFS were entitled to recover 100% of their earnest money security deposits. Defendants, individually and as co-conspirators, attempted to bully and harass PLAINTIFFS as described herein in an effort to cause PLAINTIFFS to forfeit security deposits.

66.     Defendants' acts of misrepresentation and concealment did, in fact, cause PLAINTIFFS to forfeit approximately $150 million in earnest money deposits, as well as the right to interest on said money.

67.     Defendants' acts of misrepresenting and concealing material facts concerning the development and completion of the condominiums were likely to deceive PLAINTIFFS and the general public. These acts created false promise among the general public concerning the general state of the economy. The investing public looked to the Las Vegas real estate market as a barometer of the general economy and, in particular, the performance of housing. Defendants continued to advance false information concerning plans to complete development of the condominiums. Investors throughout the country, and the world, looked to these representations as a vote of confidence by a multi-national, multi-billion dollar bank concerning the state of the economy, the real estate market, and business enterprise in the Western United States, and in Las Vegas.

68.     As a direct and proximate result of Defendants' unfair business practices or acts, PLAINTIFFS have suffered injury in fact and lost money and/or property, and BANK DEFENDANTS have received approximately $150 million of ill-gotten profits. Accordingly, PLAINTIFFS are entitled to restitution, attorneys' fees and punitive damages.

## **THIRD CAUSE OF ACTION**

### **(FRAUD AGAINST ALL DEFENDANTS)**

69.     PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

70.     Defendants, and each of them, as more particularly described herein, together, devised a plan to conceal the fact all plans to complete construction and delivery of the condominiums had been abandoned. Defendants, and each of them, deliberately misrepresented that the condominiums would, in fact, be completed and delivered, and that PLAINTIFFS were obligated to close escrow on the units. Defendants, and each of them, at all times relevant, knew BANK DEFENDANTS and Perini had no intention of completing the condominium project.

71.     At all times Defendants made the representations and concealments of material fact described herein, Defendants knew their representations were false. These false representations were made with the specific purpose of inducing PLAINTIFFS' reliance on said material misrepresentations and concealments of material fact. PLAINTIFFS reasonably relied on representations by Defendants as described herein and, in doing so, suffered economic harm. By virtue of Defendants' acts and omissions, PLAINTIFFS, who accepted the representations as true, were caused to forfeit approximately $150 million in deposits and interest.

## **FOURTH CAUSE OF ACTION**

### **(NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS)**

72.     PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

73.     Defendants, and each of them, as more particularly described herein, represented the condominiums would be completed and delivered, and that PLAINTIFFS were obligated to close escrow on the units. Defendants, and each of them, at all times relevant, knew BANK DEFENDANTS would not and could not

1  complete the condominium project or deliver PLAINTIFFS' units as required by the

2  Purchase and Sale Agreements.

3      74.    Said representations were material in nature, were untrue, and were

4  made with no reasonable grounds for believing the representations to be true.

5      75.    Said representations were made with the intent to induce PLAINTIFFS'

6  reliance, and did, in fact, induce PLAINTIFFS' reliance.

7      76.    PLAINTIFFS were unaware of the falsity of the representations, acted

8  in reliance upon the truth of the representations, and were justified in so relying. By

9  virtue of Defendants' acts and omissions, PLAINTIFFS, who accepted the

10  representations as true, were caused to forfeit approximately $150 million in

11  deposits and interest.

12

13                    **FIFTH CAUSE OF ACTION**

14          **(RESTITUTION BASED ON UNJUST ENRICHMENT AGAINST**

15                    **DEUTSCHE BANK AND NP1)**

16      77.    PLAINTIFFS hereby incorporate by reference, as though set forth in

17  full, each and all of the allegations set forth previously herein.

18      78.    BANK DEFENDANTS were unjustly enriched by virtue of the

19  referenced settlement agreements and the retention of approximately $150 million in

20  security deposits and interest from PLAINTIFFS. BANK DEFENDANTS were not

21  entitled to retain the benefit of the forfeited security deposits and interest, and

22  PLAINTIFFS are entitled to restitution of those portions of security deposits and

23  interest they were bullied and misled into forfeiting by virtue of the acts and

24  omissions of Defendants described herein.

25

26

27

28

## SIXTH CAUSE OF ACTION

## (BREACH OF CONTRACT AGAINST DEFENDANTS DEUTSCHE BANK, NEVADA PROPERTY 1, LLC, FIRST AMERICAN TITLE INSURANCE COMPANY AND NEVADA TITLE COMPANY)

79.     PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

80.     PLAINTIFFS entered into Purchase and Sale Agreements with 3700 Associates.  In March 2008, when 3700 Associates defaulted on its construction loan, Deutsche Bank, through its wholly-owned subsidiary, NP1, foreclosed on the property and acquired the condominium project and all rights and obligations to PLAINTIFFS' Purchase and Sale Agreements. At all times relevant, PLAINTIFFS were ready, willing, and able to perform their obligations on the Purchase and Sale Agreement, and the contract was enforceable.

81.     PLAINTIFFS entered into contracts with FATCO as title insurer and NTC as escrow officer in relation to purchase of the condominiums. Implied in the contract with FATCO was the requirement FATCO disclose material facts relevant to PLAINTIFFS' interests concerning the condominium units, including the fact the condominiums would not be completed. This fact was material, and its non-disclosure is the precise reason PLAINTIFFS were forced to forfeit approximately $150 million in earnest money security deposits. FATCO was contractually and ethically bound to disclose the divergence in interest between FATCO's clients (PLAINTIFFS on the one hand and BANK DEFENDANTS on the other), but failed to do so. FATCO, the title insurer for the condominiums, concealed critical information from PLAINTIFFS and, in fact, harassed and intimidated PLAINTIFFS with a letter threatening an imminent cash closing, and refused to provide any closing date.

82.     PLAINTIFFS, and each of them, employed NTC, to act as escrow agents and caretaker for the investments by PLAINTIFFS concerning the subject

1  condominiums. As PLAINTIFFS' agent, NTC, and each of them, were contractually
2  obligated to diligently perform duties as escrow agent, and not to take advantage of
3  PLAINTIFFS, to protect PLAINTIFFS' interests in the transaction, and to act as an
4  impartial escrow agent. NTC breached its contract with PLAINTIFFS by the acts
5  and omissions described herein.

6      83.    In acting as described above, NTC failed to act with the care as would
7  an ordinarily prudent escrow or escrow officer, and failed to protect PLAINTIFFS'
8  interests. Escrow officers owe a fiduciary duty to disclose material facts relevant to
9  their clients' interests.

10      84.    As a result of the breaches by Defendants, PLAINTIFFS were caused
11  to forfeit approximately $150 million in deposits and interest.

12

13  **SEVENTH CAUSE OF ACTION**

14  **(BREACH OF FIDUCIARY DUTY AGAINST FIRST AMERICAN TITLE**

15  **INSURANCE COMPANY AND NEVADA TITLE COMPANY)**

16      85.    PLAINTIFFS hereby incorporate by reference, as though set forth in
17  full, each and all of the allegations set forth previously herein.

18      86.    Escrow holders bear a fiduciary relationship to each of the parties to the
19  escrow. The escrow holder is the agent of both parties to the transaction. Stated
20  differently, an escrow holder is the agent of all the parties to the escrow at all times
21  prior to performance of the conditions of the escrow, bears a fiduciary relationship
22  to each of them, and owes an obligation to each measured by an application of the
23  ordinary principles of agency. This status as dual agent or representative continues
24  at all times before the performance of the conditions of the escrow.

25      87.    Insurers, including title insurer FATCO, owe a fiduciary duty to
26  disclose material facts relevant to their client's interests.  Where, as here, a
27  divergence in interest between FATCO's clients (PLAINTIFFS on the one hand and
28  BANK DEFENDANTS on the other) arose, FATCO was obliged to disclose that

1  divergence. Specifically, FATCO was the title insurer for the condominiums

2  PLAINTIFFS placed earnest money deposits towards; FATCO knew the

3  condominiums would not be constructed; FATCO new material facts that would

4  have entitled PLAINTIFFS to recover 100% of their earnest money security

5  deposits; FATCO concealed this information from PLAINTIFFS; FATCO harassed

6  and intimidated PLAINTIFFS with a letter threatening an imminent cash closing;

7  like BANK DEFENDANTS, FATCO refused to provide any closing date.

8        88.    PLAINTIFFS, and each of them, employed NTC to act as escrow

9  agents and caretaker for the investments by PLAINTIFFS concerning the subject

10  condominiums. As PLAINTIFFS' agent, NTC had a duty to diligently perform their

11  duties as escrow agent, and not to take advantage of PLAINTIFFS, and to protect

12  PLAINTIFFS' interests as a fiduciary.

13        89.    NTC breached its fiduciary duty to PLAINTIFFS' by virtue of the acts

14  and omissions described herein.

15        90.    In acting as described above, NTC failed to act with the care as would

16  an ordinarily prudent escrow or escrow officer, and have failed to protect

17  PLAINTIFFS' interests. Escrow officers owe a fiduciary duty to disclose material

18  facts relevant to their client's interests.  Where, as here, a divergence in interest

19  between NTC (PLAINTIFFS on the one hand and BANK DEFENDANTS on the

20  other) arose, NTC was obliged to disclose that divergence. Specifically, NTC was in

21  charge of handling the escrow for the condominiums and knew the condominiums

22  would not be constructed as set forth in the Purchase and Sale Agreements, but

23  concealed this fact from PLAINTIFFS in an effort not to "burn a bridge" with a

24  multi-billion dollar German corporation, Deutsche Bank.

25        91.    As the result of the breach of fiduciary duty described herein,

26  PLAINTIFFS forfeited approximately $150 million in deposits and interest.

27

28

CLASS ACTION COMPLAINT

# EIGHTH CAUSE OF ACTION

## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST FIRST AMERICAN TITLE COMPANY AND NEVADA TITLE COMPANY)

92.    PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

93.    The agreements entered into by FATCO and NTC, contain The Agreements contain implied covenants that these Defendants, and each of them, shall deal fairly with Plaintiff and/or their successors in interest, to wit, FATCO and NTC and shall act in good faith.

94.    FATCO and NTC, and each of them, breached said implied covenants of good faith and fair dealing by doing those acts described herein. The contract between PLAINTIFFS and FATCO, and the contract between PLAINTIFFS and NTC, carries with it a "special relationship" inherent in contracts between title insurers and escrow agents/officers.

95.    As a direct and proximate result of the breach by FATCO and NTC, and each of them, as herein set forth, PLAINTIFFS have suffered damages. Specifically, purchasers of units in the West Tower received 74.4% of their deposits, and purchasers of units in the East Tower received 68% of their deposits. But for the actions and omissions of FATCO and NTC, and each of them, described herein, PLAINTIFFS would have recovered 100% of their deposits. In all, PLAINTIFFS were caused to forfeit approximately $150 million in earnest money deposits.

# NINTH CAUSE OF ACTION

## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST DEUTSCHE BANK AG AND NEVADA PROPERTY 1, LLC)

96.     PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

97.     The agreements between PLAINTIFFS and BANK DEFENDANTS imposed upon BANK DEFENDANTS, as a matter of law, a contractual duty to disclose its true intentions regarding completion of the condominium units.  The bad faith negotiations of BANK DEFENDANTS deprived PLAINTIFFS of the benefits and protections of the purchase agreement. Implied in the contract between PLAINTIFFS and BANK DEFENDANTS was a covenant requiring the contracting parties do nothing to deprive one another of the benefits of the contract. In the instant case, as established herein, BANK DEFENDANTS negotiated in bad faith concerning their purported intentions relating to completion of PLAINTIFFS' condominium units.

98.     More specifically, a primary purpose of the purchase agreements between PLAINTIFFS and BANK DEFENDANTS was ensuring completion of the units PLAINTIFFS agreed to purchase.  BANK DEFENDANTS, as established more particularly herein, engaged in subterfuge and obfuscation to avoid acknowledging and, in fact, concealing, its decision to not complete construction of the units while the parties sought to resolve whether BANK DEFENDANTS had, or had not, breached the Agreement. These bad faith negotiating tactics impaired PLAINTIFFS' ability to ascertain whether BANK DEFENDANTS complied with the express provisions of the purchase agreements requiring completion of construction of the units. These bad faith negotiating tactics further deprived PLAINTIFFS of the express benefits of the Agreement, which was the ability to

1  enforce the requirement BANK DEFENDANTS complete construction of the units

2  or allow release of PLAINTIFFS' escrow deposits in full.

3      99.  BANK DEFENDANTS, and each of them, breached said implied

4  covenants of good faith and fair dealing by doing those acts described herein. The

5  contract between PLAINTIFFS and BANK DEFENDANTS carries with a "special

6  relationship" inherent in all contracts.

7      100.  As a direct and proximate result of the breaches by BANK

8  DEFENDANTS, and each of them, as herein set forth, PLAINTIFFS have suffered

9  damages. Specifically, purchasers of units in the West Tower received 74.4% of

10  their deposits, and purchasers of units in the East Tower received 68% of their

11  deposits. But for the actions and omissions of BANK DEFENDANTS, and each of

12  them, described herein, PLAINTIFFS would have recovered 100% of their deposits.

13  In all, PLAINTIFFS were caused to forfeit approximately $150 million in earnest

14  money deposits.

15

16  **TENTH CAUSE OF ACTION**

17  **(MONEY HAD AND RECEIVED DEUTSCHE BANK AG AND NEVADA**

18  **PROPERTY 1, LLC)**

19      101.  PLAINTIFFS hereby incorporate by reference, as though set forth in

20  full, each and all of the allegations set forth previously herein.

21      102.  BANK DEFENDANTS are indebted to PLAINTIFFS for money had

22  and received by BANK DEFENDANTS for use of PLAINTIFFS. Specifically,

23  BANK DEFENDANTS obtained approximately $150 million in forfeited sums as a

24  result of mistake, fraud, or coercion based on the circumstances set forth herein. The

25  forfeited monies were obtained pursuant to a contract that was void for illegality,

26  mistake, lack of mutual assent and other invalidating circumstances stated herein.

27      103.  The forfeited monies should have been released to PLAINTIFFS as

28  said moneys were paid under a contract that was unenforceable due to Defendants

30

1  fraudulent acts described herein, as well as the decision by Deutsche Bank and NP1

2  to abandon the object of the contracts (construction of the condominiums).

3      104.   As the result of the misdeeds described herein, PLAINTIFFS forfeited

4  approximately $150 million in deposits and interest.

5

6                    **ELEVENTH CAUSE OF ACTION**

7        **(CONVERSION AGAINST DEUTSCHE BANK AG AND NEVADA**

8                        **PROPERTY 1, LLC)**

9      105.   PLAINTIFFS hereby incorporate by reference, as though set forth in

10  full, each and all of the allegations set forth previously herein.

11     106.   At all times relevant to this cause of action, PLAINTIFFS were entitled

12  to 100% of their deposits and interest earned on the condominiums. BANK

13  DEFENDANTS, by doing those acts described herein, converted a substantial

14  portion of those deposits. Specifically, BANK DEFENDANTS converted (a) 25.6%

15  of the deposits of West Tower purchasers by deceiving said PLAINTIFFS into

16  accepting 74.4% of their condominium deposits instead of the 100% to which they

17  were entitled, and (b) 32% of the deposits of East Tower purchasers by deceiving

18  said PLAINTIFFS into accepting 68% of their condominium deposits instead of the

19  100% to which they were entitled.

20     107.   This conversion resulted in damages to West Tower purchasers of

21  25.6% of their deposits, and East Tower purchasers of 32% of their deposits. In all,

22  BANK DEFENDANTS obtained approximately $150 million in forfeited sums as a

23  result of mistake, fraud, or coercion, which acts formed the means by which BANK

24  DEFENDANTS converted PLAINTIFFS' deposits as discussed herein. In so

25  converting PLAINTIFFS' monies, BANK DEFENDANTS exercised, and continue

26  to exercise, dominion over moneys belonging to PLAINTIFFS in a manner that is

27  inconsistent with PLAINTIFFS' ownership.

28

## TWELFTH CAUSE OF ACTION

## (RESCISSION BASED ON FRUSTRATION OF PURPOSE AGAINST DEUTSCHE BANK AG AND NEVADA PROPERTY 1, LLC)

108.   PLAINTIFFS hereby incorporate by reference, as though set forth in full, each and all of the allegations set forth previously herein.

109.   The fundamental reason for PLAINTIFFS entering into the settlement agreements has been frustrated. The settlement agreements were entered because PLAINTIFFS, as a direct consequence of fraud and coercion by BANK DEFENDANTS as discussed herein, were led to believe their condominium units would be completed. Had PLAINTIFFS known, and had Defendants not concealed, the truth concerning the intentions of BANK DEFENDANTS to abandon construction of the condominium units, PLAINTIFFS would not have entered into the settlements, and would have been entitled to recover 100% of the deposits they made towards the purchase of said condominiums.

110.   PLAINTIFFS are entitled to rescind the settlement agreements on the grounds of frustration of purpose. Defendants' unanticipated fraud and deception concerning the fact BANK DEFENDANTS abandoned their plans to develop PLAINTIFFS' condominium units constituted a supervening event giving rise to PLAINTIFFS' right of nonperformance and rescission under the law. Defendants' deceptive actions were not foreseen by PLAINTIFFS, and so frustrated the purpose of the settlement agreements that its enforcement cannot fairly be regarded as within the risks that were assumed under the agreement, and the value to PLAINTIFFS of said agreement has been substantially destroyed.

1

2 **THIRTEENTH CAUSE OF ACTION**

3 **(RESCISSION BASED ON FAILURE OF CONSIDERATION AGAINST**

4 **DEUTSCHE BANK AG AND NEVADA PROPERTY 1, LLC)**

5      111. PLAINTIFFS hereby incorporate by reference, as though set forth in

6 full, each and all of the allegations set forth previously herein.

7      112. At all times relevant, PLAINTIFFS have been free from default, and

8 have performed all conditions precedent on their part relating to the matters herein.

9 In contrast, BANK DEFENDANTS have materially breached the terms of the

10 settlement agreements that form a basis of this litigation as described more

11 particularly herein. Said material breaches by BANK DEFENDANTS vest in

12 PLAINTIFFS a right to rescind the referenced settlement agreements, and to recover

13 100% of their deposits from BANK DEFENDANTS.

14

15 **FOURTEENTH CAUSE OF ACTION**

16 **(RESCISSION BASED ON FRAUDULENT INDUCEMENT AGAINST**

17 **DEUTSCHE BANK AG AND NEVADA PROPERTY 1, LLC)**

18      113. PLAINTIFFS hereby incorporate by reference, as though set forth in

19 full, each and all of the allegations set forth previously herein.

20      114. Defendants, and each of them, as more particularly described herein,

21 represented the condominiums would be completed and delivered, and that

22 PLAINTIFFS were obligated to close escrow on the units. Defendants, and each of

23 them, at all times relevant, knew that BANK DEFENDANTS would not and could

24 not complete the condominium project or deliver PLAINTIFFS' units as required by

25 the Purchase and Sale Agreements.

26      115. Defendants' representations were of a material nature, and were untrue,

27 and were made with no reasonable grounds for believing the representations were

28

1 true. Said representations were made with the intent to induce PLAINTIFFS'

2 reliance, and did, in fact, induce PLAINTIFFS' reliance.

3     116.  PLAINTIFFS were unaware of the falsity of the representations, acted

4 in reliance upon the truth of the representations, and were justified in so relying.

5     117.  PLAINTIFFS did not discover the fraud perpetrated by Defendants,

6 and each of them, until after entering into the settlement agreements. The late

7 discovery is excusable, as Defendants conspired together as more particularly

8 described herein in concealing the true intentions of BANK DEFENDANTS not to

9 complete construction of PLAINTIFFS' condominium units.

10     118.  By virtue of Defendants' acts and omissions, PLAINTIFFS, who

11 accepted the representations as true, were caused to forfeit approximately $150

12 million in deposits and interest. PLAINTIFFS are entitled to rescind the contract

13 because their consent was obtained by fraud and duress as described herein, and was

14 the result of mistake occasioned by the exercise of Defendants' connivance.

15

16                    **FIFTEENTH CAUSE OF ACTION**

17     **(RESCISSION BASED ON UNILATERAL MISTAKE AGAINST**

18          **DEUTSCHE BANK AG AND NEVADA PROPERTY 1, LLC)**

19     119.  PLAINTIFFS hereby incorporate by reference, as though set forth in

20 full, each and all of the allegations set forth previously herein.

21     120.  Unilateral mistake, coupled with hardship or unfairness, is grounds for

22 rescission.

23     121.  In the instant case, PLAINTIFFS were justified in believing BANK

24 DEFENDANTS would complete construction of the subject condominium units.

25 Had PLAINTIFFS been informed the project would not be completed,

26 PLAINTIFFS would not have relinquished any portion of their earnest money

27 deposits to BANK DEFENDANTS.

28

34

1    122.   BANK DEFENDANTS' misrepresentations, including by efforts to

2   compel PLAINTIFFS to "close" on units BANK DEFENDANTS knew had been

3   abandoned, caused PLAINTIFFS' mistaken belief the units would be completed.

4   The purpose of the settlement was to resolve the case for a reasonable value,

5   keeping with the assumption BANK DEFENDANTS had every intention of

6   completing construction.

7    123.   The mistake at issue was material in nature. But for the mistake,

8   PLAINTIFFS would never have accepted the settlement, and would never have

9   relinquished a portion of their earnest money deposits. Had the true facts been

10   known to PLAINTIFFS, PLAINTIFFS would have been entitled to recover—and

11   would have settled for nothing less than—their full earnest money deposits.

12

13                  **SIXTEENTH CAUSE OF ACTION**

14        **(RESCISSION BASED ON MUTUAL MISTAKE/LACK OF**

15        **CONSIDERATION AGAINST DEUTSCHE BANK AG AND**

16            **NEVADA PROPERTY 1, LLC)**

17    124.   PLAINTIFFS hereby incorporate by reference, as though set forth in

18   full, each and all of the allegations set forth previously herein.

19    125.   Mutual mistake and lack of consideration are grounds for rescission. In

20   the instant case, the settlement agreement is subject to rescission and voidable based

21   on mutual mistake and lack of consideration.

22    126.   The settlement between PLAINTIFFS and BANK DEFENDANTS was

23   premised on the understanding between PLAINTIFFS and BANK DEFENDANTS

24   that BANK DEFENDANTS intended to complete construction of PLAINTIFFS'

25   condominium units. At the time the settlement was entered into, the decision to

26   complete construction of PLAINTIFFS' condominium units was a matter within the

27   sole control of BANK DEFENDANTS.

28

1    127.   At all times relevant, based on the actions of BANK DEFENDANTS

2  described herein, PLAINTIFFS reasonably believed BANK DEFENDANTS would

3  complete, and had every intention to complete, construction of the units. In reality,

4  BANK DEFENDANTS either had no intention to complete, or were uncertain as to

5  their desire to complete, construction of PLAINTIFFS units at the time the

6  settlement was entered into.

7    128.   The mistaken belief concerning BANK DEFENDANTS' completion of

8  the condominium units goes to the essence of the settlement agreement.

9  PLAINTIFFS would not have agreed to relinquish earnest deposit monies if they

10  believed BANK DEFENDANTS did not plan on completing construction of the

11  units, or were undecided on the matter.

12    129.   BANK DEFENDANTS alone caused PLAINTIFFS mistaken belief the

13  units would be completed by threatening PLAINTIFFS with the loss of all security

14  deposit moneys if PLAINTIFFS did not "close" on the units.

15    130.   The settlement agreement is subject to rescission and voidable because

16  of a lack of meeting of the minds. Absent construction of the units, or plans to

17  actually complete construction, the settlement was unsupported by any consideration

18  by BANK DEFENDANTS. BANK DEFENDANTS would have legally been

19  required to return 100% of PLAINTIFFS earnest money deposits unless they

20  completed construction of the units.

21    131.   At all times relevant, PLAINTIFFS did perform all obligations and

22  conditions precedent required of them under the Agreements to purchase the subject

23  condominiums. PLAINTIFFS were, at all times, free of any default under the

24  Agreements to purchase the subject condominiums.

25    132.   PLAINTIFFS, in light of the material lack of consideration and mutual

26  mistake concerning the parties' intentions, are entitled to void the settlement

27  agreements they entered into.

28

1    133.   PLAINTIFFS were justified in believing BANK DEFENDANTS

2  would complete construction of the subject condominium units. Had PLAINTIFFS

3  been informed the project would not be completed, PLAINTIFFS would not have

4  relinquished any portion of their earnest money deposits to BANK DEFENDANTS.

5  In so relinquishing earnest security deposit monies to BANK DEFENDANTS when

6  not required to do so, PLAINTIFFS suffered a substantial economic hardship.

7    134.   The mistake at issue was material in nature. But for the mistake,

8  PLAINTIFFS would never have accepted the settlement, and would never have

9  relinquished a portion of their earnest money deposits. Had the true facts been

10  known to PLAINTIFFS, PLAINTIFFS would have been entitled to recover—and

11  would have settled for nothing less than—their full earnest money deposits.

12

13                     **PRAYER FOR RELIEF**

14      WHEREFORE, PLAINTIFFS pray for judgment in its favor against

15  Defendants as follows:

16      1.    As to causes of action numbers 1 through 11 and 14, damages in an

17  amount to be proven at trial, but no less than $150 million;

18      2.    As to causes of action numbers 1, 2, 3, 6, 7, 9, and 14, treble damages

19  and punitive damages;

20      3.    As to causes of action numbers 1 and 2, reasonable attorneys' fees;

21      4.    As to causes of action 12 through 16, rescission of the settlement

22  agreements entered into between PLAINTIFFS on the one hand and BANK

23  DEFENDANTS, on the other hand, in the consolidated case, *Watt v. Nevada*

24  *Property*, Clark County District Court Case No. A582541.

25      5.    On all causes of action, interest and costs as allowed by law; and

26

27

28

1      6.    For such further relief as may be deemed just and proper.

2  Dated: August 26, 2013         SAFARIAN & BAROIAN, LLP

3

4                      By: _____

5                         Harry A. Safarian
                            Attorneys for PLAINTIFFS

6

7               **DEMAND FOR JURY TRIAL**

8     Demand is hereby made by PLAINTIFFS, and each of them, for a jury trial.

9  Dated: August 26, 2013         SAFARIAN & BAROIAN, LLP

10

11                   By: _____

12                     Harry A. Safarian
                        Attorneys for PLAINTIFFS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT